**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**PERNELL JACKSON**
Central Detention Facility
1901 D Street, S.E.
Washington, DC 20003
*individually and on behalf of all others similarly situated*,

**KEVIN CONDRAY**
Central Detention Facility
1901 D Street, S.E.
Washington, DC 20003

**LINNELL SHELTON**
FCI Allenwood Medium
PO Box 2000
White Deer, PA 17887

**SPIRO STAFILATOS**
USP Big Sandy
PO Box 2068
Inez, KY 41224

**JUWUAN TUTT**
Central Detention Facility
1901 D Street, S.E.
Washington, DC 20003

and

**MUSTAFA WRIGHT**
Northern Neck Regional Jail
PO Box 1060
Warsaw, VA 22572
*individually*,

Plaintiffs,

v.

**DISTRICT OF COLUMBIA**,
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

Defendant.

C.A. No. 1:26-cv-3591

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND INDIVIDUAL CLAIMS FOR DAMAGES

Plaintiffs Pernell Jackson, Kevin Condray, Linnell Shelton, Spiro Stafilatos, Juwuan Tutt, and Mustafa Wright (collectively, the "Plaintiffs"), by and through undersigned counsel, bring this action against Defendant District of Columbia on behalf of themselves, individually. Plaintiff Jackson also brings this action on behalf of a class of similarly situated individuals detained pretrial in the custody of the District of Columbia's Department of Corrections, and alleges as follows.

## INTRODUCTION

1. The District of Columbia's Department of Corrections ("DOC") repeatedly feeds its residents rodents and insects—and claims it simply could not have happened. Plaintiffs Pernell Jackson, Kevin Condray, Linnell Shelton, Spiro Stafilatos, Juwuan Tutt, and Mustafa Wright are current and former detainees at the Jail who, on separate occasions, discovered deceased mice, cockroaches, and other insects embedded in the food served to them by DOC, exposing them to serious and potentially life-threatening diseases including rat-bite fever, lymphocytic choriomeningitis, leptospirosis, and salmonellosis.

2. Each time Plaintiffs reported these incidents, the DOC dismissed their complaints, denied that contamination was possible, and accused Plaintiffs of fabricating their experiences. It did so despite photographic evidence, body-worn-camera footage, official incident reports, and medical evaluations corroborating each incident. The DOC repeated a consistent, boilerplate response: that its food trays are "inspected" and "monitored" by multiple culinary staff and that contamination is therefore "unlikely" or "not possible."

3. Plaintiffs' experiences are not isolated. They reflect a pervasive and well-documented pattern of unsanitary food conditions at both the Central Detention Facility and the Correctional Treatment Facility (collectively "the Jail"). For decades, but at least since July 2023,

the District of Columbia has been on notice of these systemic failures through resident grievances, agency inspections, agency audits, third-party reporting, and legislative scrutiny—yet has failed to implement any meaningful reforms to protect the health and safety of individuals in its custody. Plaintiffs seek to recover for the harms they have experienced and to ensure they and others have access to sanitary food while confined at the Jail.

## NATURE OF ACTION

4. Individuals detained at the Jail depend on Defendant for basic necessities, including food and water.

5. Defendant has an obligation under the Fifth and Eighth Amendments to the United States Constitution to provide incarcerated individuals with reasonable living conditions that comport with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Under the Fifth Amendment, individuals detained pretrial must be provided with even "more considerate treatment and conditions of confinement" than the Eighth Amendment guarantees individuals who are convicted of crimes, given the presumption of innocence. *Banks v. Booth*, 459 F. Supp. 3d 143, 151–52 (D.D.C. 2020) (citing *Youngberg v. Romeo*, 457 U.S. 307, 322, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)). "[C]onditions of confinement that are likely to impair a detainee's mental or physical health should be subjected to the closest scrutiny and can be justified only by the most compelling necessity." *Campbell v. McGruder*, 580 F.2d 521, 531 (D.C. Cir. 1978).

6. Defendant has a statutory obligation to provide sanitary food under the D.C. Code, which provides that "[n]o person shall, within the District of Columbia, by himself or by his servant or agent, or as the servant or agent of any other person, sell, exchange, or deliver, or have in his custody or possession with the intent to sell or exchange, or expose or offer for sale or exchange, any article of food or drug which is adulterated within the meaning of this chapter."[1] The Code defines "adulterated food" as food that "consists, in whole or in part, of any filthy, putrid, or decomposed substance, or is otherwise unfit for food" or "has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."[2]

7. The D.C. Health Code, adopting the United States Food and Drug Administration's Food Code[3] with modifications, requires that "[f]ood shall be safe, unadulterated, and…honestly presented."[4] "During preparation, unpackaged food shall be protected from environmental sources of contamination."[5] "The physical facilities shall be maintained in good repair," and "[t]he physical facilities shall be cleaned as often as necessary to keep them clean."[6] "The presence of insects, rodents, and other pests shall be controlled to minimize their presence on the premises by: (a) [r]outinely inspecting incoming shipments of food and supplies; (b) [r]outinely inspecting the premises for evidence of pests; (c) [u]sing methods, if pests are found, such as trapping devices or other means of pest control…; and (d) [e]liminating harborage conditions."[7]

[1] D.C. Code § 48-101.
[2] D.C. Code § 48103. Definitions—"Adulterated article" defined.
[3] The United States Food and Drug Administration's Food Code is "a model that assists food control jurisdictions at all levels of government by providing them with a scientifically sound technical and legal basis for regulating the retail and food service segment of the industry." U.S. Food & Drug Admin., *FDA Food Code* (Dec. 9, 2025), https://www.fda.gov/food/retail-food-protection/fda-food-code.
[4] 25 D.C.M.R. § 600.1.
[5] 25 D.C.M.R. § 819.1.
[6] 25 D.C.M.R. §§ 3200.1–3201.1.
[7] 25 D.C.M.R. § 3210.1.

## PARTIES

8. Plaintiff Pernell Jackson ("Mr. Jackson") is 39 years old and has been detained pretrial at the Central Detention Facility, located in Washington, DC, since August 2022.

9. Plaintiff Kevin Condray ("Mr. Condray") is 47 years old and was detained pretrial at the Central Detention Facility, located in Washington, DC, from September 2023 to November 2023, and since March 24, 2026.

10. Plaintiff Linnell Shelton ("Mr. Shelton") is 48 years old and was detained at the Central Detention Facility, located in Washington, DC, between June 2025 and June 2026.

11. Plaintiff Spiro Stafilatos ("Mr. Stafilatos") is 39 years old and was detained pretrial at the Central Detention Facility, located in Washington, DC, from December 2022 to August 2026.

12. Plaintiff Juwuan Tutt ("Mr. Tutt") is 25 years old and has been detained pretrial at the Central Detention Facility, located in Washington, DC, since March 2026.

13. Plaintiff Mustafa Wright ("Mr. Wright") is 33 years old and was detained pretrial at the Central Detention Facility, located in Washington, D.C., between August 2025 and July 2026.

14. Defendant District of Columbia (the "District" or "Defendant") is a municipality. Defendant maintains and operates the Central Detention Facility ("CDF") and the Central Treatment Facility ("CTF"), and is and was at all relevant times responsible for the actions, inactions, policies, procedures, and practices of the Department of Corrections and its employees and/or contracted agents. Pursuant to the Fifth Amendment to the United States Constitution, Defendant is responsible for providing individuals detained pretrial with adequate food that comports with contemporary standards of decency. *See Banks v. Booth*, 468 F. Supp. 3d 101, 111 (D.D.C. 2020); *see also Campbell*, 580 F.2d at 531. Failure to do so violates the constitutional rights of those individuals.

## JURISDICTION AND VENUE

15. This action is brought under 42 U.S.C. § 1983, the Fifth Amendment to the U.S. Constitution, and the laws of the District of Columbia.

16. This Court has subject matter jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1343, and over the claims arising under District of Columbia law under 28 U.S.C. § 1367.

17. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

18. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b)(2) because Plaintiffs' claims for relief arose in this district.

## D.C. CODE § 12-309 NOTIFICATION

19. As a condition precedent to bringing this lawsuit, Mr. Jackson, Mr. Condray, Mr. Shelton, Mr. Stafilatos, Mr. Tutt, and Mr. Wright each submitted notice to the Mayor of the District of Columbia within six months of their individual incidents, respectively, providing details of the date, time, place, and circumstances of the below-described incidents, as required by D.C. Code § 12-309.

## ALLEGATIONS

### I. On Multiple Occasions, Defendant Provided Plaintiffs and Others with Unsanitary Food That Subjected Plaintiffs to a Substantial Risk of Serious Harm

20. Upon information and belief, food served for meals at the Jail is prepared in the kitchen on the bottom floor of CDF. The kitchen sits next to the CDF loading dock, which is adjacent to the facility's dumpsters. Upon information and belief, CDF is infested with mice and other vermin, including cockroaches. Vermin can access CDF through the kitchen's proximity to

the loading dock and dumpsters and through the building's poor maintenance. A lackadaisical approach to food safety and the general uncleanliness of CDF allow the vermin to thrive.[8]

21. Ingredients for the following day's meals are prepared the day before and stored overnight on shelves in the kitchen's walk-in refrigerator.

22. After the food is cooked, culinary staff assemble individual trays with the items that make up each resident's meal. Although today "trays" are meals typically served in disposable clamshell containers, upon information and belief, use of those containers increased only over the last three years. Before 2023, residents' meals were served on more traditional, open-top plastic trays.

23. Once the trays are ready, they are placed in heated[9] holding cabinets, or carts, which are designated for different institutional units at both CDF and CTF. Small bags of milk served with each meal are stored in the walk-in refrigerator in a large plastic bag, which is added to each cart.

24. The loaded carts remain in the kitchen near the loading docks for an hour or more before correctional officers transport them to resident units. Once a cart arrives in the unit, it often sits for another twenty or thirty minutes before the food is distributed. Sometimes the entire cart is returned to the kitchen because of the high number of bugs visible in and around the food.

25. On each unit, a correctional officer and a resident on work detail are supposed to deliver meal trays to each resident cell by cell. Correctional officers do not always accompany the resident on work detail.

---

[8] Kathleen Patterson, Off. of the D.C. Auditor, *Urgent Need for a New D.C. Jail* 14–18, 20–23 (May 28, 2025) [hereinafter 2025 DC Auditor Report].

[9] Although the carts have warming capability, upon information and belief, this feature is rarely used, and the food served to residents is often served lukewarm or cold.

26. Upon information and belief, mouse droppings are found in the bag of milks nearly every day, and one or more of the milk bags has a hole chewed through it, causing it to leak into the larger bag.[10]

27. Upon information and belief, the bags are not cleaned before they are distributed to residents on each unit. Because they are not provided with cups at each meal, residents often bite or tear a hole in the bag of milk and drink it directly from the bag, exposing them to bacteria from the mouse droppings.

28. Unlike food for meals, food ordered through commissary is not maintained at the Jail, but instead, individual resident orders are delivered every week, typically one to three days before the DOC distributes them, depending on the resident's floor. Residents on the first floor receive their commissary orders on Tuesdays; residents on the second floor, Wednesdays; and residents on the third floor, Thursdays.

29. Commissary orders, including pre-packaged, individually wrapped food items, arrive in clear plastic bags already organized by order number and labeled with the resident's name. Upon information and belief, once they arrive at CDF, the commissary bags are placed in large, open-top bins in a small hallway right inside the loading dock. As a result, commissary items provided to residents routinely bear evidence of (and exacerbate) the facility's mouse infestation, including holes and bite marks in/on both the bags and their contents, including bags of chips, packages of noodles, and individually wrapped honey buns.

30. Additionally, residents learn quickly that commissary bags cannot be kept on the floor of their cells or they will continue to be targeted by mice. Upon information and belief, most

[10] Often, the milk is also spoiled.

residents tie the bag to the bunk bed high off the floor or, if they do not have a cellmate, store the bag directly on the top bunk bed.

31. The presence of vermin is not limited to the kitchen, or even the lower floor of the facility. Upon information and belief, vermin have infiltrated all parts of the building, including residential units.[11] Residents report seeing rodents and insects, including mice, cockroaches, small, black worms, and drain flies, in their units and cells on a regular basis. Many residents roll towels or extra clothing and place them in the space between the bottom of the door and the floor to try to prevent vermin access to their cells.

32. Upon information and belief, the Jail is not treated by an exterminator on any regular basis.

**A. <u>Pernell Jackson</u>**

33. On August 31, 2024, Plaintiff Pernell Jackson was detained pretrial at the Jail. At around 7:10 p.m., he received his usual kosher meal tray from DOC personnel. Upon information and belief, hot kosher meals are made and prepared outside of the Jail and are delivered to Jail residents sealed. Cold kosher meals, however, are prepared at the Jail.

34. Mr. Jackson sat his unit's day room and prepared to eat his dinner, a cold salad. He added bacon bits, eggs, turkey, and dressing to his salad, and shook the container to mix the ingredients. After taking and swallowing several bites of his food, he was chewing another mouthful when he bit something chewy and out of place. Mr. Jackson looked down at his tray and discovered at least one deceased mouse in his salad. He immediately jumped back from the meal tray and vomited.

[11] 2025 DC Auditor Report at 23–24.



35. Mr. Jackson went directly to the unit's control booth and requested to speak to a high-ranking staff member, informally referred to as a "white shirt." He then met with Lieutenant Kenneth Proctor, the shift supervisor, and informed him that he had discovered a deceased mouse in his salad. Lt. Proctor took photographs of the contaminated salad.

36. Approximately twenty minutes later, Mr. Jackson was evaluated at the Jail's medical unit. Medical staff diagnosed Mr. Jackson with gastroenteritis, prescribed pain and antinausea medication, and advised him to return if his symptoms worsened.

37. That evening, an unknown officer submitted an "Official Report of Extraordinary Occurrence" describing the events as stated above. The report included a photo of the deceased mouse in Mr. Jackson's salad.

38. Despite the DOC claiming three separate times that it was not possible for a mouse to be located in Mr. Jackson's food because the food and trays are "scrutin[ized]" prior to service, a few weeks after the incident, the DOC began making announcements through the loudspeakers

prior to every meal service reminding correctional officers to inspect all food trays before they are delivered to residents.

39. Inexplicably, at some point just prior to the summer of 2025, the DOC stopped regularly making these announcements.

40. As a result of this incident, Mr. Jackson experienced ongoing physical and psychological effects, including vomiting, fear of foodborne illness, loss of appetite, gagging, nausea, stomach "bubbling," nightmares, and sustained trauma that left him "in fear for [his] living condition" and caused him to avoid consuming food from his meal trays. Mr. Jackson also began buying significantly more commissary items than he had previously, in an effort to avoid having to eat the regular meal service. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment.

**B. Kevin Condray**

41. On or about September 4, 2023, Plaintiff Kevin Condray was detained pretrial at the Jail. That evening, he was working out in his cell. Mr. Condray's dinner tray was delivered to his cell at approximately 6:30 or 7:00 p.m. The tray was an open-top, traditional meal tray. Mr. Condray covered it and placed it on his desk, and resumed his work out. After he finished working out, he was not hungry. Instead, he lay down in his bed and eventually fell asleep.

42. When he woke up, it was around 10 p.m., and the lights in his cell had been turned off, but slivers of light came through the cracks in the door from the hallway. He found and uncovered his dinner tray—red beans and rice—and began eating.

43. In his first bite, the consistency was not right. He tried to swallow the bite, but gagged and then spit out what was left in his mouth. He held the tray up to the crack in the door and realized he had chewed on a dead mouse.

44. He banged on the cell doors to get the attention of DOC staff. Eventually, Officer Gray came to Mr. Condray's cell. After he told her what happened, Officer Gray told Mr. Condray to flush the mouse down the toilet. Leery to do that, Mr. Condray walked over near the toilet and placed the mouse on the toilet seat. He then flushed the toilet to make it seem like he complied with Officer Gray's directive. Meanwhile, he grabbed a clamshell tray leftover from an earlier meal and placed the mouse inside. He then was able to conceal the tray in the back of his pants.

45. Officer Gray then left to get her supervisor, Lieutenant Oladapo. When they returned to his cell, the two escorted Mr. Condray to the medical unit, where he was examined by Dr. Beck. When Dr. Beck asked if he could see the mouse, Mr. Condray removed the tray from his clothing and showed it to Dr. Beck. Lt. Oladapo took a picture with her phone.

46. Mr. Condray was given a tetanus shot and then escorted back to his unit.

47. That evening, Lt. Oladapo submitted an "Official Report of Significant Occurreces" [sic], which confirms that Mr. Condray reported eating a mouse served in his meal tray. The report goes on to note that Mr. Condray allegedly reported that he had consumed multiple mice and he had passed them during a bowel movement. A similar report by Officer Gray recounted that Mr. Condray had "several trays" of feces in his cell. By contrast, a report by Officer Ngabe accurately notes that when Officer "Gray . . . went down to the tier to find out what was wrong . . . [Mr.] Condray . . . complain[ed] . . . that he had [a] mouse in his food."

48. After this incident, Mr. Condray suffered ongoing physical and psychological effects, including acute nausea, distress, fear of foodborne illness, loss of appetite, nightmares, and continuing anxiety regarding the safety of the meals provided by the DOC. After the incident he had a sore throat for about a week. For a couple of weeks after the incident, he routinely vomited

at mealtimes as he picked through his tray for items he felt were safe to eat. He ate very minimal food provided by the DOC until his release in early November 2023, resulting in malnourishment.

49. Since Mr. Condray was reincarcerated in March 2026, he eats only foods that he inspects and that he is confident are not contaminated—foods like waffles and pre-packaged peanut butter and jelly sandwiches. Everything else he eats he purchases from commissary. Since this incident, Mr. Condray has purchased more commissary items than he did previously. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment.

C. **<u>Spiro Stafilatos</u>**

50. On October 14, 2025, at around 7:00 p.m., Plaintiff Spiro Stafilatos, then detained pretrial at the Jail, received his dinner tray in his cell. Hungry, Mr. Stafilatos quickly began eating his food. He then discovered a deceased mouse under the bread on his tray. He immediately called out to a nearby officer and showed him the deceased mouse on his food tray.



51. The responding officer, Officer Robinson, inspected the contaminated food tray with his body-worn camera active, collected the tray, and placed it inside the control module. DOC

personnel took photographs of the tray, and it was placed into refrigeration for Risk Management inspection.

52. Mr. Stafilatos was evaluated by the urgent care physician, and a photo of the mouse was shown to the physician. Mr. Stafilatos returned to his cell with instructions to report any fever or cough.

53. That evening, the responding officer completed an "Employee Report of Significant Incident/Extraordinary Occurrences," detailing the facts described above.

54. As a result of discovering the deceased mouse inside his food, Mr. Stafilatos suffered acute distress and fear of foodborne illness, including from rodent-borne diseases, such as those described in paragraph 132. He drastically limited the DOC-provided food that he consumed, and heavily supplemented his food intake with additional items from commissary—more items than he purchased previously. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment.

**D. <u>Mustafa Wright</u>**

55. On Tuesday, November 18, 2025, at around 5:45 a.m., Plaintiff Mustafa Wright, then detained pretrial at the Jail, received his breakfast tray. Mr. Wright is on a Halal diet, and his trays were labeled with his name and dietary program. Upon information and belief, although some special diet trays are prepared outside of the Jail, Mr. Wright's meal trays were prepared inside CDF.

56. While eating, Mr. Wright bit into a large cockroach that was integrated into the potatoes on his tray. Mr. Wright began "spitting up and heaving" so violently that later, his throat was sore.

57. Mr. Wright immediately notified a nearby officer and displayed the contaminated tray to the officer's body-worn camera. He then requested that the officer call a "white shirt" and

take pictures. He also requested to go to the medical unit. The officer appeared indifferent and walked away promising to call a “white shirt”. One never came. Mr. Wright was never taken to the medical unit and was never given a replacement breakfast tray.

58. On November 27, 2025, Thanksgiving Day, Mr. Wright received a hot lunch tray, which included cranberry sauce and green beans mixed together. As he ate the cranberry sauce/green bean mixture, Mr. Wright felt something hard—inconsistent with cranberries or green beans—in his mouth and spit out his food. Upon inspection, the hard object appeared to be an insect. It was long like a worm, but hard. It was the “weirdest bug [he had] ever seen.”

59. Mr. Wright again immediately yelled for a correctional officer to come to his cell. When Officer Reed came to Mr. Wright’s cell, her body-worn camera captured their interactions.

60. Unlike the officer who responded to Mr. Wright the week before, Officer Reed did notify her supervisor. Lieutenant D. Williams responded to Mr. Wright’s cell and photographed the insect with his phone. An unknown officer later wrote an “Official Report of Extraordinary Occurrence”, corroborating the events as recounted above. He noted that he “immediately inspected the tray and observed a red object that appeared to be a dead insect.” Photographs were included in the report.





61. Although responding officers acknowledged the presence of the bug in Mr. Wright's food, in a grievance response regarding the incident, DOC staff attempted to evade responsibility, telling Mr. Wright that "food is . . . monitored by multiple people" and "the cranberry sauce came from a can . . . prepared the same day."

62. Mr. Wright was escorted to the medical unit, where he reported chewing an insect that was contained in his food, and feeling queasy as a result. The medical provider looked in his mouth and then sent him back to his unit.

63. The repeated discovery of insects embedded in Mr. Wright's meals caused ongoing physical and psychological effects, including acute nausea, psychogenic vomiting, fear of foodborne illness, and ongoing apprehension about consuming DOC-provided meals. Following these incidents, Mr. Wright limited the food he ate from the trays to things that felt safe, like bread, and when he could afford it, supplemented his "meals" with food from the commissary. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment.

**E. <u>Linnell Shelton</u>**

64. On March 9, 2026, Mr. Shelton, a practicing Muslim who celebrates Ramadan, was detained pretrial at the Jail. In line with Muslim tradition, Mr. Shelton received his dinner tray just after the sun had set, at around 7:00 p.m.

65. When he received the tray, there were two tortilla wraps sitting on top of the rest of the food. Mr. Shelton moved the wraps to begin eating and immediately noticed that there was something black in the rice. He began to stir the rice and quickly realized there was a dead mouse in his food.

66. Mr. Shelton called out to Corporal Alale, who was delivering the food with a resident on work detail, and asked him to come back to his cell.

67. Upon seeing the mouse in the tray, Cpl. Alale accused Mr. Shelton of deliberately placing the mouse in his food tray and told Mr. Shelton that he would be transported to disciplinary segregation. Cpl. Alale then walked away.

68. Approximately twenty minutes later, Mr. Shelton was transported to the medical unit. Medical staff took Mr. Shelton's vitals and asked whether Mr. Shelton had ingested any of the food. When Mr. Shelton indicated that he had not, he was sent back to his unit.

69. Upon viewing the tray, Dr. Beck, who examined Mr. Shelton, remarked that the mouse "looked like it had been boiled." DOC staff took photos of the tray.



70. That evening, an unknown officer submitted an "Official Report of Extraordinary Occurrence" describing the events as stated above. The report included a photo of the deceased mouse in Mr. Shelton's rice.

71. As a result of exposure to the mouse in his tray, Mr. Shelton suffered ongoing physical and psychological effects, including acute distress and fear of foodborne illness. Mr. Shelton did not eat at all for three or four days following the incident. After that, he endured continuing anxiety regarding the safety of the meals provided by the Jail, and he only ate items he was confident were not contaminated—items, like sandwiches, that he could thoroughly inspect. Between the incident and the time he left the Jail, he cannot remember finishing a full meal. He would not eat anything served in any sauce. When he could afford it, he bought more commissary items than he had previously, resulting in a larger number of snacks and sweets in his diet. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment, and Mr. Shelton lost weight as a result.

F. **Juwuan Tutt**

72. On August 16, 2026, Mr. Tutt was detained pretrial at the Jail. At the time, he was assigned to the work detail responsible for passing out meal trays to residents on his unit. This particular day, Mr. Tutt worked with Officer Epo[12] to hand out the trays.

73. Residents who help to hand out meals receive and eat their meal trays after everyone else has been served. After Mr. Tutt handed out a tray to each of the other residents, Mr. Tutt took a tray for himself and sat down in the day room to eat his meal.

74. The meal consisted of a deconstructed sandwich, which residents could then put together in line with their preferences. When Mr. Tutt picked up the bread, he noticed that it was broken, but did not think too much more about it. He then noticed that the cheese appeared as though it had been nibbled on. When he picked it up, a dead mouse was lying underneath it.

75. Mr. Tutt did not report the incident to staff immediately, but did call his grandmother and his mother and told them what happened. After he finished speaking with his family, Mr. Tutt notified Officer Epo, who then called all the detail workers together and in front of them, questioned why Mr. Tutt would wait so long to report something like this and how a mouse could end up in a tray in any event—insinuating that Mr. Tutt had deliberately placed the mouse in his tray.

76. After this meeting, Officer Epo called a "white shirt," who brought Mr. Tutt and Mr. Tutt's contaminated tray to the medical unit. Medical staff asked Mr. Tutt if he had consumed anything in the tray. He said that he had not. Medical staff then took his vital signs, but offered no other treatment.

[12] Spelling is phonetic.

77. As a result of exposure to the mouse in his tray, Mr. Tutt suffered ongoing physical and psychological effects, including acute nausea, loss of appetite, anxiety about foodborne illness, and ongoing apprehension about consuming DOC-provided meals. He no longer eats the vast majority of the meals served by DOC, although if he is positive it is not contaminated, sometimes he eats breakfast. He drinks several commissary-purchased cups of coffee per day to curb his appetite. He subsists mostly on food from the commissary, but because those items are so expensive, this means he generally eats only one meal per day. This limited quantity of food and the nutritional value of commissary items resulted in malnourishment.

## II. Plaintiffs' Harms are Consistent with a Larger Pattern of Unsanitary Food Contamination at the Jail

78. Plaintiffs' experiences with unsanitary food are not isolated or sporadic events. Rather, they reflect a sustained and troubling pattern of unsanitary conditions and environmental contamination within the Jail's food service systems.

79. A 2025 Report of the DC Auditor, discussed further *infra*, notes that during the audit period (July 1, 2023–June 30, 2024), 221 grievances were reported as related to "food service."[13] Moreover, Jail residents report being deterred from filing grievances.[14] A review of grievances provided in response to a Freedom of Information Act ("FOIA") request submitted in January 2025 for "[a]ll grievances submitted by DOC residents related to the quality of the food provided by the DOC to residents, including but not limited to grievances related to contaminants, vermin, bodily particles, etc. found in the food," documents that residents have reported not only the presence of deceased mice, rodent droppings, cockroaches, and other insects in meals served on food trays, but other forms of contamination, including rocks and human hairs in the food and

[13] 2025 DC Auditor Report at 3, 105, 147.
[14] *Id*. at 2.

unidentified black sediment floating in the drinking water. Together, these complaints depict an ongoing and pervasive problem affecting the safety and health of pretrial detainees at the Jail.

80. Despite the consistency and gravity of these complaints, DOC officials have responded to each grievance with nearly identical, boilerplate deflection, uniformly asserting that "the trays are inspected" and therefore the reported contamination "is not possible." These repetitive, conclusory responses reflect a failure to meaningfully investigate or address the allegations and instead suggest a routine practice of dismissing complaints rather than remedying known health and safety risks.

81. On information and belief, instead of addressing the sources of contamination, in February 2025, the DOC instituted "band-aid" policies, including loudspeaker announcements and a "Foreign Objects In Tray" reporting form. These measures are an implicit acknowledgement by decision- and policy-makers at the DOC that they are aware of a pervasive food contamination problem, yet incidents continue to occur. Further, simply removing disease-carrying vermin-contaminated trays from circulation without knowledge of how rodents and other insects are infiltrating the food preparation system continues to expose residents to life-threatening viruses and bacteria, as the animal may have come into contact with a larger serving tray.

**A. <u>D.G.</u>**

82. D.G. is 31 years old and was detained pretrial at the Jail between June 2023 and October 2024. On August 1, 2024, D.G.'s lunch tray included a piece of cake. D.G. cut into the cake, took a bite, noticed an inconsistent texture in his mouth, and spit out the food. Upon inspection, he observed a spider embedded in the cake itself and an additional spider elsewhere on the same meal tray.

83. D.G. immediately notified an Emergency Response Team officer, who notified Captain Brown. Cpt. Brown took photographs of the contaminated food and escorted D.G. to the

medical unit. Cpt. Brown verified with medical staff that he personally observed the spiders in D.G.'s food.

84. That same day, Cpt. Brown submitted an "Official Report of Extraordinary Occurrence" recounting the events as described above. The report referred to the incident as a "Possible Rotten", and noted that Cpt. Brown had requested that the officer in charge of "environmental" have D.G.'s housing unit "seen by pest control." Photographs were included in the report.





85. Medical staff took D.G.'s vitals and gave him two doses of Maalox. D.G. asked for a tetanus booster, but D.G. was told he would need to put in an additional sick call request to receive one. Medical staff minimized and inappropriately joked about D.G.'s harm, stating that "spiders got protein."

**B. <u>A.G.</u>**

86. 36-year-old A.G. was detained at the Jail between August 2024 and May 2025. On January 21, 2025, A.G. received a breakfast tray consisting of grits, potatoes, and cake. After stirring the grits, he realized they contained mouse droppings.

87. When A.G. alerted the correctional officer on duty, the officer dismissed his concerns, alleging that the droppings were "blueberries" and maintaining that the trays had been checked.

**C. <u>I.A.</u>**

88. 23-year-old I.A. was detained at the Jail from September 2023 until May 2025. On January 22, 2025, I.A. received a breakfast tray in his dark cell. After eating some of the food, he turned on the light to find a deceased baby mouse in the food on his tray.

89. I.A. notified Officer Coyote that there was something in his food. But Officer Coyote ignored him and walked away. I.A. then notified Sergeant Bryant and showed him the tray through the window in his cell door.

90. Sgt. Bryant then accused I.A. of planting the mouse and told I.A. that the mouse could not have come from the kitchen because the mouse was "not cooked". This, despite the fact that residents report that trays are left sitting on service carts for more than an hour before distribution, and that other residents have had similar experiences.

91. I.A. was evaluated by medical staff, given medication "for his stomach," and returned to his cell.

92. I.A. suffered an upset stomach and ongoing anxiety associated with food service at the Jail. Staff also continued to pressure him to admit he had staged the contamination to receive more food, compounding his distress.

**D. <u>James Doe[15]</u>**

93. On April 6, 2025, James Doe was detained pretrial at the Jail.

[15] In response to a request under the Freedom of Information Act (FOIA), undersigned counsel received several redacted reports of incidents regarding vermin in the food at the Jail. The names of the residents involved in those incidents were redacted by DOC.

94. At approximately 12:21 p.m., James Doe was eating a sandwich from his meal tray when he tasted something abnormal. He vomited, experienced continued nausea, and upon inspection, discovered a rodent tail in the food on his tray. James Doe then called out to the correctional officer who had given him his tray, who notified his supervisor.



95. When the supervisor arrived, he escorted James Doe to the medical unit. Although medical staff noted that James Doe had "[p]otential[ly] ingest[ed] rodent meat," treatment was deemed not "necessary."

96. Lieutenant Linwood Becton photographed the tray. DOC staff secured the tray in a plastic bag and stored it in the designated refrigerator at the Command Center for Risk Management retrieval. The incident was documented through an "Employee Report of Significant Incident/Extraordinary Occurrence".

97. Review of the body-worn-camera footage of the officer who distributed the trays revealed that James Doe's tray was not inspected before it was provided to him.

E. **R.W.**

98. In April 2025, 28-year-old R.W. received his breakfast tray and began to eat the oatmeal that was served. While eating the oatmeal, he discovered a cockroach and subsequently vomited.

99. When R.W. reported the cockroach, a correctional officer accused him of lying to obtain money and threatened to send him to disciplinary segregation for three months.

100. Medical staff subsequently evaluated R.W. and minimized the severity of his experience, stating that roaches are "nutritious."

101. R.W. initially refused subsequent meal trays out of fear of further contamination and experienced psychological distress that prompted him to consider mental health assistance.

F. **John Doe**

102. On May 4, 2025 around 1:00 p.m., 32-year-old John Doe found a foreign object, which appeared to be fur, embedded in the potatoes on his lunch tray.





103. The body-worn camera footage of the officer distributing the trays showed that the officer did not inspect the trays before providing them to residents.

### G. **D.W.**

104. On June 2, 2025, D.W., who was then detained pretrial at the Jail, received a lunch tray and observed what he believed to be mouse droppings on the cake. D.W. notified the correctional officer and the resident who had delivered the tray to him.

105. The correctional officer then notified a "white shirt," and the incident was memorialized via an "Official Report of Extraordinary Occurrence," noting that the responding officer's body-worn camera was activated during the incident, photographic evidence was collected, and the contaminated food tray was brought to the CTF Command Center.



106. Unknown supervisory staff confirmed the presence of a foreign substance "unlike other tray contents," secured the tray, and "proceeded with the contamination protocol."

107. Upon information and belief, rodent feces are routinely found on cakes at the Jail, as cakes are generally prepared in advance of their planned service to residents, and are not stored in containers with secure covers.

### H. **D.P.**

108. In late August or early September 2025, 33-year-old D.P. was detained pretrial at the Jail. One evening, he had eaten several bites of the pasta dish on his dinner tray when he noticed what appeared to be a tail in his food. In stirring his food, he uncovered a small mouse. He immediately notified a "white shirt" on his unit and was escorted to the medical unit.

109. DOC staff took photographs of the mouse in the food.

**I. J.M.**

110. In March 2026, J.M. and Mr. Shelton, referenced above, were cellmates. At the time, he, too, was incarcerated pretrial. He is 43 years old.

111. Approximately one week after Mr. Shelton found a mouse in his food, J.M., who was also on a Halal diet, received his lunch tray. He was not hungry when the tray arrived, so he set it down in the cell, still closed, for later.

112. When he opened the tray, he found that one compartment of the tray contained two packets of peanut butter for him to use to make a peanut butter and jelly sandwich. One of the packets was directly on top of the other. When J.M. picked up the packet that was on the bottom, he noticed that peanut butter had leaked out into the tray.

113. When he looked closely at the packet, he could clearly tell that the packet had claw and bite marks from a rodent, which had pierced the packaging, causing the peanut butter to leak into the tray. J.M. notified Corporal Alale of this incident, who made another comment suggesting that J.M. had sabotaged his own tray, and as with Mr. Shelton, threatened to take J.M. to disciplinary segregation.

114. J.M. asked Corporal Alale to notify a "white shirt" about this incident, but he refused to do so. No photographs were taken, and J.M. was not issued a replacement tray.

**III. Defendant is Aware of the Jail's Unsanitary Food Conditions, which are Objectively Unreasonable**

115. Together with its knowledge of the incidents described in ¶¶ 1-114, incorporated by reference herein, Defendant has been aware of unsanitary food conditions at the Jail that pose a substantial risk of serious harm through numerous third-party and government agency reports dating as far back as 2015.

116. For decades, the District of Columbia's carceral facilities have been subject to intense judicial and legislative scrutiny for substandard living conditions, including overcrowding, unsafe environments, and unsanitary housing.[16] Defendant has long been on notice that food served at the Jail is routinely prepared and delivered in ways that are unsanitary and unsafe, as multiple independent investigations and government inspections since at least the 1970s have documented inedible, moldy, vermin-infested meals, unsanitary preparation areas, and nutritionally insufficient food.[17]

117. In 2015, the Washington Lawyers' Committee for Civil Rights and Urban Affairs issued a report on the conditions of confinement in the Jail.[18] According to the report, D.C. Department of Health inspection reports from Fall 2013 and Spring 2014 both found that "'[t]here is an active infestation of vermin/pests throughout the [Jail]."[19] Additionally, "[t]here were numerous sanitation issues in the kitchen, such as unsanitary equipment and improper temperature control for refrigerated foods."[20]

118. In 2019, the Office of the District of Columbia Auditor issued a report, based on years of D.C. Department of Health inspection records and related documentation, finding repeated violations of public health and sanitation standards in the Jail's culinary operations and food service, including unsanitary conditions in food preparation areas and persistent environmental health deficiencies.[21] The Auditor specifically reported that DOC and its food service contractor,

---

[16] Ed Pound *et al.*, Off. of the D.C. Auditor, *Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks* 7-9, 17 (Feb. 28, 2019), https://dcauditor.wpenginepowered.com/wp-content/uploads/2023/08/D.C.Jail_.Report.2.28.19.pdf, at 7-9, 17; U.S. Gov't Accountability Off., *Management Challenges Exist in Improving Facility Conditions* (Aug. 2024), https://www.gao.gov/assets/gao-04-742.pdf.

[17] *See Food in the DC Jails*, DC Justice Lab (Apr. 1, 2024), https://dcjusticelab.org/food-in-the-dc-jail/.

[18] *See D.C. Prisoners: Conditions of Confinement in the District of Columbia* (June 11, 2015), https://www.washlaw.org/pdf/conditions_of_confinement_report.PDF.

[19] *Id.* at 14.

[20] *Id.*

[21] Pound *et al.*, *supra* note 16 at 7–9, 17.

Aramark Correctional Services LLC,[22] were cited for repeated violations of the District's food safety regulations, including failure to keep food and non-food contact surfaces clean and sanitized, receipt and service of food at improper temperatures, failure to keep kitchen equipment in good repair, and failure to control pests in the culinary area where they came into contact with food.[23] In light of these persistent violations, the Auditor recommended that DOC conduct regular documented monitoring of Aramark's compliance with all contract requirements and District food safety laws and sanction the contractor where appropriate.[24] Upon information and belief, the District has failed to implement any meaningful reforms in response to this DOC report, especially given that the D.C. Auditor found in her follow-up 2025 report *Urgent Need for a New D.C. Jail* that "[r]esidents and staff have reported food contaminated with rotten or inedible materials, including bugs, rodents, and screws, improperly heated meals, and potentially contaminated water."[25] The report further highlighted that that one resident "found a dead mouse in the middle of their food" and "DOC staff's reply… was that the allegations could not have happened because each food tray is checked before it is served."[26]

119. In October 2021, the United States Marshals Service ("USMS") conducted an unannounced inspection of the Jail and found multiple systemic failures, including that "[f]ood delivery and storage is inconsistent with industry standards."[27] Less than a month after the

---

[22] As of the filing of this Complaint, Aramark remains DOC's food service contractor, although the District of Columbia recently solicited bids for "Department of Corrections Inmate Food Services and Management," with a bid submission deadline of October 5, 2026. *See* District of Columbia Contracts and Procurement Transparency Portal, Solicitation Number Doc815306, https://contracts.ocp.dc.gov/solicitations/details?id=Doc815306&hash=kg333hmu2dk71mg5.

[23] Pound *et al.*, *supra* note 16 at 8.

[24] *Id.*

[25] 2025 DC Auditor Report at 2.

[26] *Id.* at 112.

[27] U.S. Marshals Service November 1, 2021 Memorandum to D.C. Dept. of Corr., https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/.

inspection, the USMS concluded that "conditions [at CDF] do not meet the minimum standards of confinement as prescribed by the Federal Performance-Based Detention Standards" and promptly moved all individuals in their custody out of CDF.[28]

120. Other District of Columbia agency and third-party reports corroborate these findings and further placed the Defendant on notice regarding unsanitary and harmful food conditions at the Jail. In 2023, the DC Jail Food Working Group, a cooperative of non-profit and non-governmental organizations and returned citizens, developed a survey that would help advocates better understand the nature of the issues surrounding the food at the Jail.[29] The results, published by DC Greens, a nonprofit organization founded in 2009 which aims to improve access to quality, nutritious food across the District, indicated that 7 of 10 respondents[30] reported receiving spoiled or rotten food, and respondents consistently described food as unsafe and unsanitary.[31] One survey respondent stated, "I had a dead mouse in my food."[32]

121. The D.C. Council's legislative response to these more recent reports confirms Defendant's awareness of these conditions. In March 2024, following years of organizing around and public documentation of food conditions, Councilmember Brooke Pinto, along with seven other Councilmembers, introduced the Food Regulation Ensures Safety and Hospitality Specialty Training Aids Re-entry Transition and Success (FRESH STARTS) Act of 2023, which aimed to improve the quality of food in DOC facilities, including through publicly reported food quality

---

[28] *Statement by the U.S. Marshals Service Re: Recent Inspection of DC Jail Facilities*, U.S. Marshals Service (Nov. 2, 2021), https://www.usmarshals.gov/news/press-release/statement-us-marshals-service.

[29] DC Greens, *We're Hungry in Here: Food Insecurity Behind the Walls of D.C.'s Jails* (Nov. 2023), https://dcgreens.org/wp-content/uploads/2024/07/DCG-Doc-Food-Survey_FINAL-Nov-7-23.pdf, at 3.

[30] The survey was distributed in both electronic and paperwork format between June and July 2023 by then-Advisory Neighborhood Commissioner (7F07) Leonard Bishop. 330 individuals responded, split about equally between residents of the Jail and residents of the Correctional Treatment Facility.

[31] DC Greens, *supra* note 29 at 12.

[32] *Id.* at 3.

and safety inspections of DOC's food service operations.[33] Although the Act did not advance out of Committee, the Council included the Bill's inspection requirements in the Secure DC Omnibus Amendment Act of 2024.[34] This portion of the bill, however, remains unfunded,[35] and the problem persists.

122. Despite detailed and repeated notice of pervasive and ongoing reports of food contamination, in response, the DOC has implemented woefully inadequate, limited, and superficial policy changes that have failed to address the root causes of the problem. In the two months following D.G.'s and Mr. Jackson's August 2024 incidents, the DOC began making routine announcements reminding staff to inspect meal trays for contaminants before distribution. However, reports and security footage confirm that these procedures are not consistently followed or enforced, and residents indicate the announcements are no longer made.

123. Although in at least 2010, the Jail's food service policy had a provision governing pest control and inspection in/around the kitchen, and required the DOC to request a quarterly D.C. Department of Health inspection of its food service operation,[36] those provisions were rescinded by the 2013 iteration of the policy.[37] In 2017, pest control measures returned, and a provision requiring that any pests on food trays in the housing units to be reported to the Jail's Risk Manager was also included.[38] In early 2025, a form was created for the report to the Risk Manager, which specifically noted that the contaminated food tray was to be preserved for further investigation. Moreover, the Risk Manager was required to "investigate all reports of pests and/or foreign objects and . . . report to [the] Director, Deputy Director of Administration and O[ffice of the ]G[eneral

---

[33] Food Regulation Ensures Safety and Hospitality Specialty Training Aids Re-entry Transition and Success (FRESH STARTS) Act of 2023, DC B25-0112, https://www.billtrack50.com/billdetail/1560571
[34] Secure DC Omnibus Amendment Act of 2024, DC Law 25-175, Sec. 32.
[35] D.C. Code § 24-211.09.
[36] D.C. Dept. of Corr., Policy and Procedure No. 2120.3B: Food Service Program (Dec. 10, 2010).
[37] D.C. Dept. of Corr., Policy and Procedure No. 2120.3D: Food Service Program (June 20, 2013).
[38] D.C. Dept. of Corr., Policy and Procedure No. 2120.3E: Food Service Program (Apr. 25, 2017).

]C[ounsel] all findings and outcomes by completing an investigation form".[39] The form required the review of surveillance video, body-worn camera footage, photographs, and witness statements.[40] It also contemplated potential corrective action and the need for a kitchen inspection.[41]

124. These "band-aid" measures, however, do not even attempt to remedy the Jail's widespread vermin infestation caused in part, upon information and belief, by food and waste storage in receptacles immediately adjacent to the kitchen loading dock in an aging building, and food safety issues including the failure to store food in airtight containers and failure to seal refrigerators to prevent entry by vermin. As a result, rodents and other pests are regularly attracted to and able to access kitchen areas where residents' meals are prepared and stored.

125. Conditions in the Jail's kitchen and food service areas remain unsanitary and dangerous. One resident, T.M., who was on detail in the kitchen in the spring of 2024, reported that he saw four to five mice in the kitchen daily—sometimes in the walk-in refrigerator—in addition to cockroaches. He noted that food is routinely found with bite marks, and that he personally observed mouse droppings on cake served during the Thanksgiving meal, though he was not on work detail to the kitchen at that time. While he worked in the kitchen, T.M. also observed Aramark contractors complain about the kitchen being dirty, and himself wrote multiple grievances about supposedly clean trays that remained dirty.

126. Despite the DOC claiming in its resident grievance responses that there can be no contaminated food because the food and trays are "scrutin[ized]" prior to service, loudspeaker

[39] D.C. Dept. of Corr., Policy and Procedure Change Notice 25-005: Food Service Program (Feb. 24, 2025).
[40] *Id.*
[41] *Id.*

announcements prior to every meal service reminding correctional officers to inspect all food trays before they are delivered to residents belie that position.

127. Inexplicably, at some point just prior to the summer of 2025, the DOC stopped regularly making these announcements.

128. The persistence of these conditions after multiple internal incident reports, grievances, policy changes, third-party and government agency findings, and legislative action demonstrate that the DOC has, with awareness of the severity of the problem, wholly failed to address known causes of vermin infestation and subsequent food contamination. Considering this knowledge and the persistence of the problem, Defendant's failure to take effective corrective action to protect its incarcerated residents from ongoing risk of harm is objectively unreasonable.

## IV. Jail Conditions Exposed Plaintiffs and Continue to Expose Members of the Putative Class to a Substantial Risk of Serious Harm

129. The vermin-infested food that class members consumed threatened their immediate health. Beyond the physical harm and psychological distress caused by consuming part of a rodent or an insect in one's food, rodents and inspectts also carry numerous bacterial and viral diseases that can be spread through contaminated food.

130. The conditions at issue pose a substantial and well-documented risk of serious illness and death, particularly in congregate settings such as correctional facilities. According to the Centers for Disease Control and Prevention ("CDC"), incarcerated and detained individuals are six times more likely than the general public to experience an illness associated with a foodborne disease outbreak.[42] This heightened vulnerability is not theoretical. Between 1998 and 2014, at least 200 foodborne disease outbreaks were reported in U.S. correctional institutions,

[42] Naomi Drexler *et al.*, Model Food Safety Practices for Correctional Facilities, Centers for Disease Control and Prevention (2024), https://www.cdc.gov/correctional-health/publications/food-safety.html, at 1

resulting in 20,625 illnesses, 204 hospitalizations, and five deaths.[43] This data demonstrates that failures in sanitation, pest control, and food safety in custodial environments predictably translate into widespread illness and, in some cases, fatal outcomes.[44]

131. Uncontrolled rodent infestations significantly compound these risks. The CDC has long recognized that rats and mice are vectors for numerous serious zoonotic diseases transmitted through bites, urine, saliva, or droppings, as well as through contamination of food and food-preparation surfaces.[45] Among these diseases is rat-bite fever (which can be spread through contact with all rodents, not just rats), including its Haverhill fever form, which can cause systemic infections affecting major organs, including the liver, kidneys, lungs, heart, brain, and nervous system.[46] Rodents are also the primary reservoir for lymphocytic choriomeningitis, a viral disease that can progress to severe neurological complications, including inflammation of the brain, its membranes, and the spinal cord, and a buildup of fluid on the brain.[47] In addition, rodents commonly carry Leptospira bacteria, which cause leptospirosis—an illness responsible for approximately one million human infections globally each year and nearly 60,000 deaths.[48] Rodent contamination further facilitates the spread of salmonellosis, which the CDC identifies as a leading cause of hospitalizations and deaths linked to foodborne illness.[49]

[43] Mariel A. Marlow, PhD *et al.*, *Foodborne Disease Outbreaks in Correctional Institutions—United States, 1998-2014*, Am J Public Health (July 2017), https://stacks.cdc.gov/view/cdc/47474, at 1.
[44] *Id.*
[45] Centers for Disease Control and Prevention, *Controlling Wild Rodent Infestations* (Apr. 8, 2024), https://www.cdc.gov/healthy-pets/rodent-control/index.html.
[46] Centers for Disease Control and Prevention, *About Rat Bite Fever (RBF)* (July 9, 2024), https://www.cdc.gov/rat-bite-fever/about/index.html
[47] Centers for Disease Control and Prevention, *About Lymphocytic Choriomeningitis* (Jan. 30, 2025), https://www.cdc.gov/lymphocytic-choriomeningitis/about/index.html.
[48] Centers for Disease Control and Prevention, *About Leptospirosi*s (Feb. 10, 2026), https://www.cdc.gov/leptospirosis/about/index.html.
[49] Centers for Disease Control and Prevention, *About* Salmonella *Infection* (Oct. 4, 2024), https://www.cdc.gov/salmonella/about/index.html

132. Exposure to rodent droppings alone poses a significant risk of illness even absent direct contact with animals.[50] Mouse and rat droppings are known to harbor bacteria and viruses that can be transmitted through inhalation of contaminated dust, ingestion of contaminated food, or contact with mucous membranes.[51] The CDC warns that such exposure can cause serious and sometimes fatal disease—such as Hantavirus—particularly in enclosed or poorly ventilated spaces—both of which exist at the Jail.[52] Taken together, the presence of rodents and cockroaches, combined with inadequate sanitation and food safety controls, creates conditions that foreseeably and unreasonably endanger the health and safety of confined individuals, resulting in a substantial risk of serious illness, hospitalization, and death.[53]

133. Cockroach infestations present an independent and equally serious public health hazard. Scientific literature has established that approximately one quarter of the microorganisms isolated from cockroaches are foodborne pathogens.[54] These include Escherichia coli ("E. coli"), which can lead to life-threatening complications such as sepsis;[55] Salmonella enterica serovar Typhi, which causes a potentially fatal bacteremic illness;[56] and Staphylococcus aureus, infections of which can result in severe or fatal outcomes.[57] Cockroaches mechanically transmit these pathogens by moving between waste, sewage, and food-contact surfaces, thereby contaminating food, utensils, and preparation areas.[58] Cockroaches can also spread deadly bacteria "via feces

---

[50] Centers for Disease Control, *supra* note 42.
[51] *Id*.
[52] Centers for Disease Control and Prevention, *About Andes Virus* (May 29, 2026), https://www.cdc.gov/hantavirus/about/andesvirus.html.
[53] Centers for Disease Control, *supra* note 42.
[54] Eric S. Donkor, *Cockroaches and Food-borne Pathogens*, Environmental Health Insights (Apr. 30, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7218330/
[55] Cleveland Clinic, *E. coli Infection* (Nov. 22, 2023), https://my.clevelandclinic.org/health/diseases/16638-e-coli-infection.
[56] Centers for Disease Control and Prevention, *Salmonella Typhi infection (Salmonella enterica serotype Typhi) 2019 Case Definition* (Apr. 16, 2021), https://ndc.services.cdc.gov/case-definitions/salmonella-typhi-infection-2019/.
[57] Centers for Disease Control and Prevention, *Staphylococcus aureus Basics* (Apr. 15, 2024), https://www.cdc.gov/staphylococcus-aureus/about/index.html; Donker, *supra* note 51.
[58] Donker, *supra* note 51.

and other deposits, particularly members of the family *Enterobacteriaceae*, but also *Staphylococcus* and *Mycobacterium* species," and thus scientists insist "they should be cleared from sites where hygiene is essential, such as hospitals and kitchens."[59] In environments where food is prepared or served, the presence of cockroaches substantially increases the likelihood of foodborne disease outbreaks.[60]

134. The presence of spiders in food or food-preparation areas also indicates unsanitary conditions. Although spiders are not typical disease vectors, their webs, egg sacs, droppings, and remains can contaminate food, packaging, and food-contact surfaces. Their presence also suggests an underlying insect or pest-control problem, creating additional food-safety risks.[61]

## CLASS ACTION ALLEGATIONS

135. Plaintiff Jackson brings this action on behalf of himself and a class of similarly situated individuals under Fed. R. Civ. P. 23, defined as: all people who are or will be incarcerated pretrial at the Jail.

136. This action is brought, and may properly be maintained, as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Rule 23(a), and at least one of the prerequisites of Rule 23(b).

137. Numerosity: The proposed classes satisfy the requirements of Rule 23(a)(1) because the class is so numerous that joinder is impracticable. In the first half of 2026, the average population of the Jail was over 2,160 people per day.[62] During the week of October 3, 2026, the

---

[59] Guzman et al., *Bacteria associated with cockroaches: health risk or biotechnological opportunity?* (Oct. 31, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7671988/.
[60] Centers for Disease Control, *supra* note 42.
[61] Presto-X, *How spiders can impact your business,* https://www.prestox.com/services/pest-control/spider-control/business-impact-of-spiders.

[62] DOC Population Statistics Average Daily Population for January 2017 through June 2026, DC Department of Corrections,

population of the Jail was over 2,250 people per day.[63] All of these individuals rely on the DOC for three meals per day. Additionally, the inclusion of future members and the transient nature of the Jail population both make naming and joining each individual member practically impossible and therefore independently support a finding that the class is so numerous that joinder is impracticable.

138. Commonality: The class meets the commonality requirements of Rule 23(a)(2). The class shares common questions of law and fact including, but not limited to:

(a) Whether the Jail is infested with vermin, and whether the vermin contaminate food preparation, food storage, and food service areas so as to present a substantial risk to the health and well-being of the Jail's residents, creating conditions that are objectively unreasonable in violation of the Constitution;

(b) Whether the food served at the Jail is prepared and served under conditions which present a substantial risk to the health and well-being of the residents who consume it, creating conditions that are objectively unreasonable in violation of the Constitution;

(c) Whether Defendant knew or should have known that storing food and other waste immediately adjacent to the kitchen loading dock with knowledge of the Jail's deteriorating exterior, would allow vermin to infiltrate the building, creating a substantial risk to the health and well-being of the Jail's

---

https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DOC%20Population%20Statistics%20Average%20Daily%20Population%20for%20January%202017%20through%20June%202026.pdf.

[63] Daily Population Report, DC Department of Corrections, https://doc.dc.gov/sites/default/files/dc/sites/doc/documents/The%20Daily%20Population%20Report%20from%20October%203rd%20through%20October%209th%202026_0.pdf.

residents, and failed to adequately respond, creating conditions that are objectively unreasonable in violation of the Constitution;

(d) Whether Defendant knew or should have known of multiple instances of vermin in the food and/or in food preparation or storage spaces, creating a substantial risk to the health and well-being of the Jail's residents, and failed to adequately respond, creating conditions that are objectively unreasonable in violation of the Constitution;

(e) Whether Defendant's inadequate response to the substantial risk to the health and well-being of the Jail's residents caused by the Jail's vermin infestation and the infiltration of those vermin into the food operation system violates contemporary standards of decency, creating conditions that are objectively unreasonable in violation of the Constitution;

(f) Whether injunctive relief should be issued; and

(g) The appropriate form of injunctive relief.

139. Typicality: The proposed class meets the typicality requirements of Rule 23(a)(3). The claims of all class members arise from their incarceration in the Jail and their reliance on Defendant to provide them safe food to eat. Plaintiff Jackson and all class members were, and are likely in the future, to be deprived of constitutionally adequate food service. Thus, the claims of Plaintiff Jackson are typical of the claims of the class because their claims arise from the same policies, practices, and courses of conduct, and his claims are based on the same theory of law as the class's claims.

140. Adequacy: The proposed class meets the adequacy requirements of Rule 23(a)(4) because Plaintiff Jackson will fairly and adequately protect and represent the interests of the class.

Plaintiff Jackson has no interests adverse to or in conflict with the class members whom he proposes to represent. In addition, Plaintiff Jackson is represented by counsel who are experienced and competent in the prosecution of civil rights litigation and have particular expertise with respect to class actions based on civil rights violations of individuals in custody, including specifically at the Jail.

141. Rule 23(b)(2): The proposed class meets the requirements of Rule 23(b)(2) because Defendant refuses to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. A single injunction addressing Defendant's failure to meet its constitutional obligations to those in its pretrial custody would provide relief to each member of the class.

## CLAIMS FOR RELIEF

### Count I

### Violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983

142. Plaintiff Jackson, on behalf of himself and a class of persons similarly situated, restates and re-alleges Paragraphs 1-141 as if fully set forth herein.

143. A municipality is liable under 42 U.S.C. § 1983 for constitutional violations that result from the implementation or execution of a municipal policy, practice, or custom.

144. The Due Process Clause of the Fifth Amendment of the United States Constitution prohibits the deprivation of "life, liberty, or property without due process of law." This prohibition confers an affirmative duty upon government officials to care for and protect incarcerated individuals in their custody.

145. At all relevant times, Mr. Jackson and members of the proposed class were or will be in the custody or care of Defendant, and thus Defendant, through its agents, acting under color

of District of Columbia law, had a duty to protect the safety and well-being of Mr. Jackson and members of the proposed class.

146. As described above, Mr. Jackson and members of the proposed class suffer and will continue to suffer violations of their Fifth Amendment rights based on Defendant's municipal policies, practices, and customs of failing to prevent or adequately respond to vermin infestation and contamination of the food at the Jail.

147. As evidenced by the experience of Mr. Jackson and numerous other residents, described above, Defendant has a policy, practice, or custom of failing to adequately address the Jail's aging infrastructure or the Jail's vermin infestation, properly clean or secure food preparation and storage spaces, and inspect food prior to delivering it to residents. In so doing, Defendant has subjected Mr. Jackson and members of the class to a substantial risk to their health and well-being that violates contemporary standards of decency.

148. This policy, practice, and custom is evidenced by a broad pattern of vermin in the food served at the Jail over multiple years, during which time Defendant failed to intervene to correct unsanitary conditions related to the storage and preparation of food in the Jail, as well as Defendant's failure to meaningfully, let alone adequately, respond to multiple internal, third-party, and government agency reports of vermin in the food at the Jail.

149. These practices have been and continue to be implemented by Defendant and its agents, officials, employees, and all persons acting in concert with them under color of District of Columbia law, and are objectively unreasonable, and as result, constitute unconstitutional pretrial punishment in violation of the Fifth Amendment.

150. As a result, Mr. Jackson and members of the proposed class were or will be exposed to contaminated food and have suffered or will suffer irreparable injury, including a substantial

risk of foodborne illness caused by the presence of vermin in food or food preparation or storage areas, stomach pain, vomiting, appetite loss, nightmares, monetary loss, anxiety, mental anguish, and emotional distress. No adequate, readily available, and complete remedy at law exists to address Defendant's wrongful conduct against members of the class as described herein, and as a result declaratory and injunctive relief is necessary to prevent both on-going and future injury to members of the class.

## **Count II**

### **Violation of the Fifth Amendment pursuant to 42 U.S.C. § 1983**

151. Plaintiffs Jackson and Wright, individually, restate and re-allege Paragraphs 1-141 as if fully set forth herein.

152. A municipality is liable under 42 U.S.C. § 1983 for constitutional violations that result from the implementation or execution of a municipal policy, practice, or custom.

153. The Due Process Clause of the Fifth Amendment of the United States Constitution prohibits the deprivation of "life, liberty, or property without due process of law." This prohibition confers an affirmative duty upon government officials to care for and protect incarcerated individuals in their custody.

154. At all relevant times, Mr. Jackson and Mr. Wright were in the custody or care of Defendant, and thus Defendant, through its agents, acting under color of District of Columbia law, had a duty to protect the safety and well-being of Plaintiffs.

155. As described above, Mr. Jackson and Mr. Wright suffered violations of their Fifth Amendment rights based on Defendant's municipal policies, practices, and customs of failing to prevent or adequately respond to vermin infestation and contamination of the food at the Jail.

156. As evidenced by the experiences of Mr. Jackson, Mr. Wright, and numerous other residents, described above, Defendant has a policy, practice, or custom of failing to adequately address the Jail's aging infrastructure or the Jail's vermin infestation, properly clean or secure food preparation and storage spaces, and inspect food prior to delivering it to residents. In so doing, Defendant has subjected Mr. Jackson and Mr. Wright to a substantial risk to their health and well-being that violates contemporary standards of decency.

157. This policy, practice, and custom is evidenced by a broad pattern of vermin in the food served at the Jail over multiple years, during which time Defendant failed to intervene to correct unsanitary conditions related to the storage and preparation of food in the Jail, as well as Defendant's failure to meaningfully, let alone adequately, respond to multiple internal, third-party and government agency reports of vermin in the food at the Jail.

158. These practices have been implemented by Defendant and its agents, officials, employees, and all persons acting in concert with them under color of District of Columbia law, and are objectively unreasonable, and as result, constitute unconstitutional pretrial punishment in violation of the Fifth Amendment.

159. As a result, Mr. Jackson and Mr. Wright ingested contaminated food and have suffered irreparable injury, including a substantial risk of foodborne illness caused by the presence of vermin in food or food preparation or storage areas, stomach pain, vomiting, appetite loss, nightmares, monetary loss, anxiety, mental anguish, and emotional distress. Mr. Jackson and Mr. Wright are thus entitled to compensatory damages in an amount to be determined at trial.

## Count III

## Negligence

160. Plaintiffs Condray, Jackson, Shelton, Stafilatos, Tutt, and Wright restate and re-allege Paragraphs 1-141 as if fully set forth herein.

161. Plaintiffs were at all relevant times individuals in the custody of Defendant and confined at the Jail.

162. Defendant owed Plaintiffs a duty to exercise reasonable care to provide food that is free from foreign matter and contamination, and to maintain food service areas in sanitary condition consistent with basic food-handling standards, and it was foreseeable that a breach of that duty would injure Plaintiffs.

163. Defendant breached that duty by:

(a) Allowing a widespread vermin infestation in the Jail, which infiltrated the kitchen and walk-in refrigerator where meals are prepared and stored;

(b) Storing food and other waste immediately adjacent to the kitchen loading dock with knowledge that the failing structural integrity of the building would allow vermin to enter;

(c) Failing to use airtight containers and failing to seal refrigerators to prevent vermin access;

(d) Serving Plaintiffs food contaminated with vermin or other foreign objects; and

(e) Failing to implement and enforce effective inspection, sanitation, and pest-exclusion practices despite repeated notice of contamination incidents, including internal reports and resident grievances.

164. As a direct and proximate result of Defendants' breach, Plaintiffs ingested or were exposed to contaminated food, causing a substantial risk of foodborne illness, stomach pain,

vomiting, appetite loss, nightmares, monetary loss, anxiety, mental anguish, and emotional distress.

165. Defendant is vicariously liable for the torts of its officers and agents acting in the scope of their employment, and as a result, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial. Additionally, because the conduct at issue was outrageous and in a willful disregard of Plaintiffs' rights, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## Count IV

## Negligent Infliction of Emotional Distress

166. Plaintiffs Condray, Jackson, Shelton, Stafilatos, Tutt, and Wright restate and re-allege Paragraphs 1-141 as if fully set forth herein.

167. Plaintiffs were at all relevant times individuals in the custody of Defendant and confined at the Jail. As Plaintiffs' custodian, Defendant had a relationship with Plaintiffs that necessarily implicated Plaintiffs' emotional well-being.

168. Defendant owed Plaintiffs a duty to exercise reasonable care to provide food that is free from foreign matter and contamination, and to maintain food service areas in sanitary condition consistent with basic food-handling standards, and it was foreseeable that breach of that duty would place Plaintiffs at risk of physical injury or cause serious emotional distress.

169. Defendant breached that duty by:

(a) storing food and other waste immediately adjacent to the kitchen loading dock with knowledge that the failing structural integrity of the building would allow vermin to enter;

(b) allowing a widespread vermin infestation in the Jail, which infiltrated the kitchen and walk-in refrigerator where meals are prepared and stored;

(c) failing to use airtight containers and failing to seal walk-in refrigerators to prevent vermin access to food;

(d) serving Plaintiffs food contaminated with vermin; and

(e) failing to implement and enforce effective inspection, sanitation, and pest-exclusion practices, despite repeated notice of contamination incidents, including resident grievances.

170. As a direct and proximate result of Defendant's breach, Plaintiffs ingested or were exposed to contaminated food, placing Plaintiffs in the zone of physical injury for foodborne illness, stomach pain, vomiting, appetite loss, nightmares, monetary loss, and/or causing serious emotional distress.

171. Defendant is vicariously liable for the torts of its officers and agents acting in the scope of their employment, and as a result, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial. Additionally, because the conduct at issue was outrageous and in a willful disregard of Plaintiffs' rights, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## Count V

## Negligent Training and Supervision

172. Plaintiffs Condray, Jackson, Shelton, Stafilatos, Tutt, and Wright restate and re-allege Paragraphs 1-141 as if fully set forth herein.

173. Plaintiffs were at all relevant times individuals in the custody of Defendant and confined at the Jail.

174. At all times relevant, Defendant had a duty to ensure that all DOC staff, including contract staff, were properly trained and supervised.

175. Defendant breached its duty to Plaintiffs by failing to adequately train and supervise its employees and agents in the mitigation of vermin infestation at the Jail, which allowed vermin to infiltrate the Jail's food storage and service systems.

176. Multiple third-party and government agency reports, internal incident reports, and resident grievances put Defendant on notice that its staff, including correctional officers, civilians, and contractors, were behaving in a dangerous or otherwise incompetent manner, including with respect to the following:

(a) storing food and other waste immediately adjacent to the kitchen loading dock, attracting vermin;

(b) failing to properly remedy the structural integrity of the Jail, allowing vermin to enter;

(c) failing to effectively inspect and mitigate a widespread vermin infestation in the Jail;

(d) failing to use airtight containers to store food, allowing vermin to thrive;

(e) failing to properly seal walk-in refrigerators, allowing vermin to thrive;

(f) serving Plaintiffs food contaminated with vermin; and

(g) failing to effectively respond to multiple reports regarding the continued infestation of vermin at the Jail, including its infiltration into the food service system.

177. Despite knowledge of this behavior, Defendant failed to properly train, redirect, or otherwise supervise its staff. Indeed, the fact that, for at least six months beginning in late 2024,

the DOC began making announcements reminding correctional officers to inspect all food trays before they are delivered to residents demonstrates that Defendant was aware that its employees were behaving in an unsafe and ineffective manner. The fact that there continued to be multiple instances of vermin in the food during and following these announcements is evidence that the Defendant's response was insufficient.

178. As a direct and proximate result of Defendant's breach, Plaintiffs ingested or were exposed to contaminated food, causing physical injury, including nausea, stomach pain, vomiting, appetite loss, and nightmares, monetary loss, and corresponding psychological distress. As a result, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial. Additionally, because the conduct at issue was outrageous and in a willful disregard of Plaintiffs' rights, Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similar situated, respectfully request that this Court:

(A) Issue an order certifying this action to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

(B) Approve the undersigned to serve as class counsel pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g);

(C) Issue a judgment declaring that Defendant's policies, practices, and customs as described herein violate the rights of Plaintiffs and members of the class under the Fifth Amendment of the United States Constitution and the laws of the District of Columbia;

(D) Permanently enjoin Defendant, its, agents, employees, representatives and all others purporting to act in concert with it or on its behalf from subjecting Plaintiffs

and members of the class to the unlawful and unconstitutional treatment described herein, and issue such orders as are necessary and/or appropriate to preclude such conduct on an ongoing basis, including:

(1) an order for an immediate inspection of the outside of the building for vermin or other outside element access which may facilitate vermin infestation, continued at regular intervals, and to take all remedial steps recommended by the inspector;

(2) an order for an immediate inspection of the inside of the building for evidence of vermin infestation or intrusion of outside elements which may facilitate vermin infestation, continued at regular intervals, and to take all remedial steps recommended by the inspector;

(3) an order that the building is exterminated for vermin at regular intervals, beginning immediately;

(4) an order that the kitchen and any other pantry or place where food is regularly stored, used, or cooked, is immediately inspected for evidence of vermin infestation, continued at regular intervals, and to take all remedial steps recommended by the inspector;

(5) an order that all food that is to be served to residents is stored in airtight containers;

(6) an order requiring Defendant to create a policy governing the daily inspection of food for evidence of vermin at various stages of the food preparation process; and

(7) an order requiring Defendant to create a policy governing mitigation responses when inspections reveal evidence of vermin at any stage of the food preparation process;

(E) Maintain ongoing supervisory jurisdiction of this matter in order to monitor and enforce the Defendant's full and continuing compliance with the injunctive relief ordered herein;

(F) Award Plaintiffs compensatory damages and punitive damages;

(G) Award Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(H) Grant Plaintiffs and members of the class such further relief as this Court may deem just and proper in the interests of justice.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully submitted,

By: */s/ Kristin L. McGough*

Kristin McGough, DC Bar No. 991209
Sydney Hartman, DC Bar No. 90029056
Allie Dodd, DC Bar No. 90040153
(*Application for admission forthcoming*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036
Telephone: (202) 282-5000
kristin.mcgough@winstontaylor.com
sydney.hartman@winstontaylor.com
allie.dodd@winstontaylor.com

*Counsel for Plaintiffs*